**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ISCHEBECK USA, INC. and FRIEDR. ISCHEBECK GMBH; | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No.  3:23-cv-919 |
| CONCRETE SUPPORT SYSTEMS, LLC and MARK GRACE, | ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) ) | |

## COMPLAINT

Plaintiffs, Friedr. Ischebeck GmbH ("Ischebeck GmbH") and Ischebeck USA, Inc. ("Ischebeck USA") (collectively, "Ischebeck"), by and through the undersigned counsel, and for their Complaint against Defendants Concrete Support Systems, LLC ("CSS") and Mark Grace, allege as follows:

## NATURE OF THE ACTION

1.      This is a civil action for trademark infringement, trade dress infringement, unfair competition, false designation of origin, and breach of contract arising from a willful and wanton course of conduct by CSS.

2.      CSS has engaged in a campaign of infringement, unfair competition, and false advertising in order to trade on the immense goodwill related to Ischebeck and its products. CSS has also deceitfully provided counterfeit equipment designed to look exactly like genuine Ischebeck equipment. CSS has also made false claims to the public about the counterfeit equipment. CSS has also serially breached its contractual agreements with Ischebeck by refusing to pay Ischebeck for rental of Ischebeck's products and by refusing to return equipment CSS leased from Ischebeck.

3.     In April 2012, Ischebeck USA and CSS entered an agreement (the "Distributor Agreement"), negotiated and drafted by Mark Grace, whereby CSS became the exclusive U.S. distributor of Ischebeck's concrete shoring and forming equipment, including Ischebeck's famous TITAN-HV and MEGASHORE product lines.

4.     Under the Distributor Agreement, CSS promoted the Ischebeck equipment using Ischebeck's trademarks, product names, product literature, and promotional materials provided by Ischebeck.

5.     CSS derived immense benefit from Ischebeck's business reputation and goodwill in the U.S. construction industry, where CSS came to be widely known as the U.S. distributor of genuine Ischebeck equipment.

6.     After riding the wave of Ischebeck's goodwill for several years, CSS, under the direction of Mark Grace, devised a scheme whereby CSS could continue to capitalize on Ischebeck's goodwill while avoiding payment to Ischebeck for rental equipment. To accomplish this scheme, CSS began making imitation shoring props that are designed to look identical to genuine Ischebeck Megashore props (the "Counterfeit Props").

7.     The Counterfeit Props copied all the well-known and distinctive features of Ischebeck's Megashore props, including the octagonal shape of the outer tube and the blue coloring of the disk at the base of the tube. The photos below show the Megashore trade dress next to a Counterfeit Prop:

 

*Genuine Megashore Prop*                      *Counterfeit CSS Prop*

8.      CSS commingled the Counterfeit Props with its inventory of genuine Ischebeck props. CSS then continued to promote **<u>all</u>** the equipment—both genuine Ischebeck equipment and counterfeit equipment—using **<u>Ischebeck</u>** trademarks, trade dress, product names, product literature, and promotional materials.

9.      CSS has also claimed that all of its products—including the Counterfeit Props—have been "rigorously tested at accredited laboratories" and are the "safest" systems available on the market. On information and belief, these are false statements, and CSS has <u>never</u> tested its Counterfeit Props.

10.     CSS also falsely represents to the public that testing data for **<u>Ischebeck</u>** props also applies to the **<u>Counterfeit Props</u>**, such that the public would believe the Counterfeit Props had been duly tested and found to satisfy performance criteria.

11.     CSS has also provided its Counterfeit Props to customers who ordered genuine Ischebeck equipment. Most, if not all, of these customers never realized they received knock-off

equipment because the knock-off equipment is identical in appearance to the genuine Ischebeck equipment.

12. In 2021, when Ischebeck duly and fairly terminated the Distributor Agreement, CSS engaged in a pattern of misrepresentation and duplicity, constantly changing its story and refusing to return Ischebeck's equipment. Defendant Mark Grace was the principal source of the misrepresentations.

13. For months, Ischebeck tried to work with CSS and Mark Grace in good faith to resolve the disputes. Ischebeck went to great lengths to accommodate CSS's professed business needs and concerns. Unfortunately, CSS has met Ischebeck's efforts with further duplicity and dissembling.

14. For example, when Ischebeck confronted CSS regarding its claims of performance and load capacity for the Counterfeit Props, CSS produced testing information that related to an **entirely different** product. To the best of Ischebeck's knowledge, CSS has never had its Counterfeit Props tested.

15. CSS also refuses to return thousands of pieces of Ischebeck's equipment, worth well over $1 million. CSS claims that it has returned all Ischebeck's leased equipment, but CSS also continues to pay rent for the equipment. The stories simply do not hold water.

16. CSS's actions leave Ischebeck no choice but to file this lawsuit. Ischebeck seeks to protect the consuming public from CSS's deception, to protect Ischebeck's own business reputation and goodwill, and to be made whole for CSS's refusal to abide by its agreements and return Ischebeck's equipment.

## THE PARTIES

17.     Friedr. Ischebeck GmbH is a German limited liability company with its principal place of business in Enneptal, Germany.

18.     Ischebeck USA, Inc., is a corporation organized in Florida and with its principal place of business in Florida. Ischebeck USA is a wholly-owned subsidiary of Ischebeck, Döpp GmbH & Co. KG, a German limited liability company.

19.     CSS is a limited liability company organized and existing under the laws of the State of Florida, with its principal place of business at 3409 Pelican Landing Parkway, Suite 3, Bonita Springs, FL 34134.

20.     On information and belief, Mark Grace is a member and the President of CSS and resides in Harris County, Texas.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338, and 1367. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367, as those claims form part of the same case or controversy.

22.     This Court has personal jurisdiction over CSS, at least because CSS does business in the State of Connecticut in a manner substantially related to the subject matter of this action; CSS has at least one business location in this district; CSS is intentionally promoting its products to residents of this district under infringing marks; CSS assented to jurisdiction in this district for claims arising from the Distributor Agreement at issue; and CSS's wrongful acts described herein include acts committed in this district.

23.     This Court has personal jurisdiction over Mark Grace, at least because he personally directed and controlled the tortious and unlawful actions described herein.

24.     Venue is proper in this district under § 1331 because CSS is subject to personal jurisdiction in this judicial district, and this is the district in which events giving rise to the claims hereinafter set forth occurred.  Venue is also proper in this district pursuant to the forum selection clause contained in the parties' Distributor Agreement, which provides that "[a]ny action or proceeding by either of the parties against the other arising out of or relating to this Agreement; the making, performance, non-performance, or termination thereof; or any transaction in that connection, may only be brought in any federal or state court located in the State of Connecticut. . . . ." *See* Exhibit A, Distributor Agreement.

## FACTUAL BACKGROUND

### I.     Ischebeck is a global leader in forming and shoring equipment.

25.     Friedr. Ischebeck GmbH was founded in 1881 by blacksmith Friedrich Ischebeck. In the 140+ years since its inception, Ischebeck GmbH has grown to become a global leader in the manufacture and supply of geotechnics, trench shoring, and formwork equipment. Ischebeck GmbH remains a family-run business, and the company is now led by managing directors Björn Ischebeck and Dr. Lars Ischebeck.

26.     Ischebeck developed and manufactured the first aluminum telescopic shoring prop worldwide, and Ischebeck continues to lead the field in shoring and forming equipment for construction projects, including concrete construction projects.

27.     Ischebeck's industry-leading shoring and forming equipment includes the famous ISCHEBECK TITAN line of shoring props. These feature the "Titan HV" and "Megashore" props, which are manufactured with an extruded aluminum outer tube. The Titan HV outer tube has a generally t-shaped cross section, and the Megashore outer tube has a distinctive octagonal cross-

section.  Both the Titan HV and the Megashore props include a "screw jack" that fits within the outer tube, with a wing nut on the threaded portion of the screw jack that secures the jack in place:



**Titan HV**                                              **Megashore**

28.     The octagonal shape of Ischebeck's Megashore prop is further illustrated in the figures below:

          

29.    Ischebeck's Megashore props also incorporate a disk between the octagonal outer tube and the screw jack wing nut that features a distinctive blue coloring, as illustrated in the images below:



30.    Ischebeck's Titan-HV and Megashore props can be incorporated into Ischebeck's forming and shoring systems, including the Titan-HV support system and the Megashore support system. Examples of these systems are pictured here:



*TITAN HV Support System (with TITAN HV props)*

8



*MEGASHORE Support System (with MEGASHORE props)*

31.    The Megashore support system is recognized as the leading product in its field by professionals in the construction and civil engineering industries.

32.    Over several decades, Ischebeck has expended tremendous resources cultivating its brand and reputation, including through the design and development of unique high-quality concrete shoring equipment, which it has consistently promoted in connection with its MEGASHORE, TITAN-HV, ISCHEBECK MEGASHORE, TITAN, and ISCHEBECK TITAN marks (the "Ischebeck Marks").

33.    As a result of these efforts, consumers have come to associate the Ischebeck Marks and unique product designs with Ischebeck, and they expect high-quality, reliable, and safe equipment when purchasing Ischebeck products.

34.    Ischebeck owns valuable and enforceable trademark rights in the Ischebeck Marks in connection with its shoring and forming equipment. Ischebeck also owns incontestable U.S. trademark registrations for ISCHEBECK MEGASHORE (U.S. Trademark Reg. No. 3938774),

TITAN-HV (U.S. Trademark Reg. No. 4326227), and ISCHEBECK TITAN (U.S. Trademark Reg. No. 1759445) (the "Ischebeck Registrations"). Copies of the Ischebeck Registrations are attached hereto as Exhibits B, C, and D.

35.    Ischebeck has invested and continues to invest substantial resources in promoting its products and services under the Ischebeck Marks.

36.    As a result of Ischebeck's decades of steadfast promotion, investment, and stewardship, the Ischebeck Marks have acquired a strong and favorable public recognition and serve associating Ischebeck with the immense goodwill it has achieved among those in the construction industries.

37.    Ischebeck USA uses the Ischebeck Marks in the United States as a licensee of Ischebeck GmbH.

38.    While it was an authorized distributor of Ischebeck equipment, CSS promoted and traded on the strength of the Ischebeck Marks and the goodwill represented by the Marks.

39.    Ischebeck also owns valuable and enforceable trade dress rights in the appearance of its Megashore props resulting from the combination of octagonal cross-section and blue coloring of the disk between the wing nut and the outer tube of the props (the "Megashore Prop Trade Dress), as depicted in the images below:



40.     Consumers of shoring equipment distinguish the props of individual suppliers based on the appearance resulting from their cross-sectional shapes and color schemes.

41.     The Megashore Prop Trade Dress has achieved secondary meaning as a source identifier in the minds of the relevant consuming public. Consumers recognize Ischebeck Megashore props based on the overall look of the props, including specifically the combination of octagonal cross-sectional shape and the distinctive blue coloring of the disk between the wing nut and the outer tube of the prop.

42.     Ischebeck USA has used the Megashore Prop Trade Dress exclusively in the United States for more than ten years. Megashore props are some of the best-known products of their kind

in the United States, and they have been used on major construction projects throughout the United States, from skyscrapers to parking garages.

43.     In the period from 2015 to 2020 alone, Ischebeck USA earned nearly $10 million in revenue from Megashore props that embody the Megashore Prop Trade Dress. This does not include the total revenues earned for Megashore support systems incorporating Megashore props.

44.     Since 2015 alone, Ischebeck USA has spent more than $330,000 advertising and marketing Megashore props that incorporate the Megashore Prop Trade Dress in the United States. This is an especially significant amount of money given the non-traditional nature of the marketing typically used in the industry. Megashore props are promoted and marketed in targeted fashion at places like industry trade shows and through in-person demonstrations, as opposed to broad advertising through mass media to the general public.

45.     Consumers in the construction industry have come to associate the Megashore Prop Trade Dress with a single supplier, and consumers distinguish the Megashore props from other third-party props based on the overall appearance of Megashore props, and in particular the combination of octagonal cross-section and blue coloring of the disk.

46.     The acquired distinctiveness of the Megashore Prop Trade Dress is also demonstrated by the fact that CSS intentionally copied every detail of the Megashore props' appearance for its Counterfeit Props, when CSS could have chosen any number of other cross-sectional shapes and/or color schemes for its own props.

47.     The Megashore Prop Trade Dress is non-functional. The octagonal shape and the blue disk color, alone and in combination, are arbitrary design choices.

48.     Neither the octagonal shape nor the blue disk color of the Megashore prop, alone or in combination, is essential to the use or purpose of the prop. Nor do the elements affect the cost or quality of the prop to the end-user.

49.     To the extent that the octagonal shape and/or the blue coloring of the disk is disclosed in Ischebeck's expired German utility patents and/or other utility patents, the disclosure is incidental and exemplary and does not evidence utilitarian aspects of the trade dress.

50.     Ischebeck's promotional materials do not promote, and have not promoted, utilitarian advantages of the octagonal cross-section or the blue coloring of the disk, alone or in combination.

51.     Construction shoring props designed for the same applications as Megashore props, including telescopic aluminum props, can be made in and come in a variety of numerous alternative cross-sectional shapes, including rectangular, square, round, and other polygonal shapes.

52.     The disk in a construction shoring prop can be presented in any color, other than blue, without affecting the utility of the disk or the prop.  There is no competitive need in the industry for the distinctive blue coloring of the disk in the Megashore props.

53.     For example, the "Multiprop" product from Peri USA has an aluminum outer tube with a roughly quadrilateral cross-sectional shape and color scheme that is not confusingly similar to the Megashore Prop Trade Dress, as seen here in images from the Peri USA website:[1]

---

[1] *www.peri-usa.com*




54.     As another example, Hi-Lite Systems offers props featuring an aluminum outer tube with a round cross-section and a different color scheme, as seen in this image from the Hi-Lite website:[2]



55.     Hi-Lite's product literature features an alternative cross-sectional shape of its props, as seen for example here:

_____

2 *www.hi-lite-systems.com*



56.     These are just a few examples demonstrating that props can be manufactured with any number of cross-sectional shapes and color schemes without affecting their utility or function.

57.     Accordingly, the Megashore Prop Trade Dress is non-functional and has acquired distinctiveness in the minds of the relevant public. The Megashore Prop Trade Dress serves as a valuable source identifier for Ischebeck's genuine props.

**II.     Ischebeck and CSS enter into the Distributor Agreement.**

58. On April 1, 2012, Ischebeck USA and CSS entered into an agreement (the "Distributor Agreement") whereby CSS became the exclusive distributor of Ischebeck's concrete forming and shoring equipment and related accessory materials (the "Products") in the continental United States. A copy of the Distributor Agreement is attached hereto as Exhibit A.

59.     The Distributor Agreement was drafted by Mark Grace.

60.     The Distributor Agreement was signed by Gunter Sengel as President of Ischebeck USA and Mark Grace as President of CSS. From the time the Distributor Agreement was executed to present day, Gunter Sengel has been a Director and/or Executive Vice President of CSS.

61.     From October 1, 2009, to June 30, 2021, Gunter Sengel was President of Ischebeck USA, Inc. On February 23, 2012, while still President of Ischebeck USA, Inc., Gunter Sengel formed CSS. Attached as Exhibit E is a copy of the Electronic Articles of Organization for CSS,

taken from the website of the Florida Secretary of State. The Electronic Articles of Organization identify Gunter Sengel as the Registered Agent and the sole managing member/manager of CSS.

62.     On April 2, 2012—the day after the Distributor Agreement was executed—the Articles of Organization for CSS were amended to show Mark Grace as President of CSS and to change Gunter Sengel's title from Director to Executive Vice President of CSS. Attached as Exhibit F is a copy of the Amendment to the Articles of Organization for CSS, taken from the website of the Florida Secretary of State.

63.     Under the Distributor Agreement, CSS became the exclusive distributor of Ischebeck concrete forming and shoring equipment in the continental United States (with a few enumerated exceptions).

64.     During the term of the Distributor Agreement, CSS leased Ischebeck Products to its customers. CSS customers used the Products leased from CSS on construction jobs and projects and/or leased the Products in turn to their own downstream customers.

65.     During the term of the Distributor Agreement, CSS also purchased Ischebeck Products. On information and belief, CSS sold to its customers some of the Ischebeck Products that CSS had purchased under the Distributor Agreement.

66.     During the term of the Distributor Agreement, Ischebeck provided CSS with promotional and technical material about Ischebeck's Products. The materials featured Ischebeck Marks and Megashore Prop Trade Dress. CSS used those materials in connection with the promotion, leasing, and sale of Ischebeck's Products.

67.     For several years, the parties operated under the Distributor Agreement with Ischebeck selling and leasing its concrete shoring and forming equipment to CSS, and CSS, in turn, selling and leasing the Ischebeck equipment to CSS customers.

68.     As a result of CSS's position as exclusive distributor of Ischebeck's Products under the Distributor Agreement, as well as CSS's use of Ischebeck trademarks, trade dress, literature, and product names in connection with Ischebeck equipment, the relevant consuming public came to identify CSS as the U.S. distributor of Ischebeck equipment and to draw an association between CSS and Ischebeck.

69.     The Distributor Agreement prohibited CSS from making revisions or improvements to the Products without written consent from Ischebeck USA.  *See* Exhibit A at § 3.

70.     The Distributor Agreement prohibited CSS from publishing any promotional materials that referred to the Products or used any Ischebeck "Marks" (defined as "the name 'Ischebeck' and any other trademarks, service marks, logos, or symbols used to brand or label the Products") without prior approval from Ischebeck.  *See* Exhibit A at § 3.

71.     Under the Distributor Agreement, "Marks" included ISCHEBECK, TITAN, TITAN HV, ISCHEBECK TITAN, MEGASHORE, ALU MEGASHORE, ALU BEAM, ALU TITAN, and ALU BEAM TITAN, as well as each Part Number for each Product listed in Exhibit A to the Distributor Agreement.

72.     Under the Distributor Agreement, CSS promised to comply with "any and all applicable governmental laws, regulations and orders related to the sale of the Products."  *See* Exhibit A at § 3.

73.     The Distributor Agreement prohibited CSS from disclosing Ischebeck's confidential information—including pricing methods, manufacturing details, technical manuals, and product drawings—to any third party without Ischebeck's written permission.  *See* Exhibit A at § 12.

74.     CSS also promised that, upon termination of the Distributor Agreement, CSS would:

a.      return all Ischebeck equipment in CSS's possession at the time of termination (*i.e.*, not in the possession of CSS customers) in the same condition as at the beginning of the lease period, reasonable depreciation through normal and customary use excepted;

b.      return all other Ischebeck USA equipment upon completion of then-ongoing customer jobs and projects (or sooner, if CSS so chose);

c.      return "any and all products literature, advertising, confidential material or other materials" which CSS has in its possession and which were previously furnished to CSS by Ischebeck;

d.      immediately cease any activity tending to give the impression that the relationship between Ischebeck USA and CSS still existed; and

e.      pay for the repair of any leased products that were returned in a damaged state and that Ischebeck thereafter repaired.

*See* Exhibit A at §§ 8.4; 17.4.

75.     For Products subject to re-rent to a CSS customer upon expiration or termination of the Distributor Agreement, CSS could, at its option, re-rent the Products to the customer through the end of the then-ongoing customer job or project. *See* Exhibit A at § 8.4. The Distributor Agreement provided that Ischebeck USA would continue to bill CSS for such un-returned Products at the same continuing rental rate until the Products were returned. *Id.* CSS was required to return such re-rented Products to Ischebeck USA upon completion of the customer's then-ongoing job or project. *Id.*

76.     The Distributor Agreement prohibited CSS from retaining Ischebeck's leased Products after the completion of the specific customer jobs or projects that were ongoing at the time the Distributor Agreement terminated or expired. *See* Exhibit A at § 17.4.

**III.    Ischebeck terminates the Distributor Agreement, and the parties enter into an implied-in-fact contract.**

77.    On December 2, 2020, Gunter Sengel sent an email to Mark Grace, notifying CSS that Ischebeck USA was terminating the Distributor Agreement, effective on January 1, 2021.  *See* Exhibit G, Termination Letter.

78.    At the time Gunter Sengel sent the Termination Letter, he was an officer of both Ischebeck USA and CSS.

79.    CSS did not object to the timing or substance of the Termination Letter.

80.    The Termination Letter terminated the Distributor Agreement.

81.    At the time the Distributor Agreement was terminated, the applicable rental rate for Products was one percent (1%) of the List Price of each Product.

82.    On and after January 1, 2021, Ischebeck and CSS operated under an implied-in-fact contract that substantially mirrored the terms of the Distributor Agreement.

83.    The implied-in-fact contract was terminable at will by either party.

84.    Under the parties' implied-in-fact contract, Ischebeck agreed that CSS could continue to lease certain equipment that it had previously leased pursuant to the Distributor Agreement, at the same rental rate that had been in effect when the Distributor Agreement was terminated.

85.    Under the parties' implied-in-fact contract, CSS was not required to pay rent to Ischebeck on any of Ischebeck's equipment that was in CSS's possession but was not leased to a CSS customer.

86.    Under the parties' implied-in-fact contract, when equipment was returned by CSS to Ischebeck that was damaged, CSS was required to pay Ischebeck to repair the damage, or if the

equipment was damaged beyond repair, CSS would be required to pay Ischebeck for that equipment.

87.    Under the parties' implied-in-fact contract, CSS was responsible for shipping costs when it returned equipment to Ischebeck.

88.    Under the parties' implied-in-fact contract, all invoices were due thirty days after the invoice date.

89.    On June 3, 2021, Ischebeck requested that CSS finally return to Ischebeck all Ischebeck equipment in CSS's possession. *See* Exhibit H, June 2021 emails with CSS.

90.    The parties reached an agreement (the "return agreement") that modified the existing implied-in-fact contract.

91.    The parties agreed that CSS would return all Ischebeck equipment in its possession by June 15, 2021 (including any of Ischebeck's equipment that, as of June 3, 2021, was then being leased by CSS to an end-user customer), or CSS would be charged rent on all outstanding equipment starting on June 16, 2021.

92.    CSS further agreed that, when an end-user customer's project finished, CSS would notify Ischebeck when the Ischebeck products used by that end-user customer were returned to CSS's warehouse, and Ischebeck would stop charging rent for that equipment. CSS then had 14 days to inspect the equipment and return it to Ischebeck. If the Ischebeck product was not returned to Ischebeck at the end of those 14 days, Ischebeck would begin again charging CSS rent for the unreturned product.

93.    The terms of this return agreement modified the parties' implied-in-fact contract. CSS's assent to the terms of the return agreement is derived from the continued conduct of

Ischebeck and CSS, their course of dealing, their course of performance and the facts and circumstances surrounding their business relationship

94.     Despite its agreement to return all Ischebeck equipment in its possession (and in the possession of its end-user customers), CSS has failed and refused to return all equipment to Ischebeck.

95.     Further, despite Ischebeck's repeated requests, CSS has failed to provide Ischebeck with a complete list of all outstanding equipment and the location of all Ischebeck-owned material.

96.     On information and belief, CSS has knowingly continued leasing Ischebeck's equipment to its customers, despite that the Distributor Agreement has been terminated and CSS agreed to return all equipment directly to Ischebeck.

97.     On information and belief, upon completion of CSS's end-user customers' completed projects, CSS has transferred the leased Ischebeck equipment that was used in the completed project directly to new customer projects, instead of returning the Ischebeck equipment to Ischebeck per the terms of the parties' agreement.

98.     In February 2022, Ischebeck sent CSS a letter again demanding CSS return all leased equipment to Ischebeck and stating that, if it failed to do so, Ischebeck would charge CSS 2% rent for all equipment that had not been returned to Ischebeck and had been transferred without authorization from Ischebeck, effective April 1, 2022. A copy of this letter is attached hereto as Exhibit I.

99.     CSS indicated its agreement to the 2% rental rate and a schedule for return of Ischebeck's leased equipment.

100.    CSS has failed and refused to return all Ischebeck equipment. Specifically, CSS has failed to return approximately 5,600 pieces of leased equipment with a total list price of about $1.36 million.

101.    CSS's story with respect to the un-returned equipment is constantly evolving. CSS initially claimed that it already returned to Ischebeck all the equipment CSS leased from Ischebeck, but CSS has also at times claimed that the un-returned equipment is simply lost. CSS has also paid some rent payments to Ischebeck USA for the allegedly "lost" equipment.

102.    CSS has refused to disclose the location of all Ischebeck equipment, making it impossible to distinguish between equipment that has been transferred between projects and any other equipment in CSS' possession. Accordingly, Ischebeck charged CSS 2% of the list price of rented equipment for all equipment that CSS had failed to return.

103.    Some of the equipment that CSS returned was not the same equipment that Ischebeck had leased to CSS. The equipment was of a type that pre-dated the 2012 Distributor Agreement. Ischebeck refused to accept this outdated and inferior equipment in place of the equipment it had actually leased to CSS.

104.    Some of the equipment that CSS returned was damaged and required repair. CSS has refused to pay for the repair of damaged equipment as agreed by the parties. The unpaid repair costs total $121,701.21.

105.    CSS has further failed and refused to honor the 2% rental rate from April 1, 2022, instead paying a 1% rate, or half the agreed rental rate. Consequently, CSS owes Ischebeck about $481,914.84 in unpaid rent, summarized as follows by month (through the filing of this Complaint):

    a.    April 2022:         $ 68,948.08

    b.    May 2022:          $ 68,452.13

| | | |
|---|---|---|
| c. | June 2022: | $ 56,562.97 |
| d. | July 2022: | $ 44,175.12 |
| e. | August 2022: | $ 43,466.86 |
| f. | September 2022: | $ 41,572.24 |
| g. | October 2022: | $ 38,583.67 |
| h. | November 2022: | $ 21,817.69 |
| i. | December 2022: | $ 16,334.72 |
| j. | January 2023: | $ 16,334.72 |
| k. | February 2023: | $ 15,705.55 |
| l. | March 2023: | $ 16,834.72 |
| m. | April 2023: | $ 16,291.65 |
| n. | May 2023: | $ 16,834.72 |

**III.   Ischebeck learns that CSS is passing off its own knock-off equipment as genuine Ischebeck products to unsuspecting customers.**

106.   Since the parties have terminated their relationship, Ischebeck has discovered that CSS is engaged in a willful, deliberate and deceptive campaign to sell its own imitation version of the Megashore prop, including to customers who ordered genuine Megashore props and believed they were receiving genuine Megashore props.

107.   After the initiation of the Distributor Agreement in 2012, CSS came to be widely known in the industry as the exclusive distributor of genuine Ischebeck concrete shoring and forming products. CSS promoted the Ischebeck products using Ischebeck product names and trademarks, as well as testing and performance data relating to Ischebeck products. As a result, contractors and others in the U.S. concrete construction industry associated CSS with genuine Ischebeck products.

108.    The image below shows the cover of a Megashore product brochure that CSS used. The brochure features the distinctive octagonal shape and blue-colored disk of the Megashore Prop Trade Dress:



109.    After several years of providing only genuine Ischebeck equipment, CSS commissioned a third-party company to manufacture props that are exact copies—at least in appearance—of Ischebeck Megashore props.

110.    CSS copied every detail of the appearance of genuine Ischebeck Megashore props, including the shape, dimensions, color scheme, prop sizes, and overall appearance. In particular, the Counterfeit Props feature the same distinctive octagonal cross-section and blue coloring of the

disk as the genuine Ischebeck Megashore props, as featured on the cover of the Megashore product literature CSS used.

111.     On information and belief, CSS provided the third-party manufacturer with confidential specifications and other confidential information in connection with commissioning the manufacture of Counterfeit Props.

112.     The Counterfeit Props are designed to be virtually indistinguishable in appearance from the genuine Ischebeck Megashore props.

113.     The images below, which were taken at the jobsite of a CSS customer near Phoenix, AZ, show the identical appearance of the genuine Ischebeck Megashore prop and the Counterfeit Prop:




*Genuine Ischebeck Megashore Prop*                    *Counterfeit CSS Prop*

114.    After receiving the Counterfeit Props from its manufacturer, CSS commingled the Counterfeit Props with its inventory of genuine Ischebeck Megashore props.

115.    In violation of the Distributor Agreement, CSS then continued to promote **all** the equipment—both the genuine Ischebeck equipment and the Counterfeit Props—using substantially the same Ischebeck literature, trademarks, trade dress, product names, part numbers, and performance data that Ischebeck had previously authorized CSS to use only in connection with genuine **Ischebeck** products. CSS referred to both genuine Ischebeck Megashore props and Counterfeit Props as "Megashore" or "MegaShore" props.

116.    On information and belief, the Counterfeit Props are of inferior quality, construction, and workmanship, and they are made with inferior materials, as compared with genuine Ischebeck Megashore props, and are thus compromised in safety.

117.    CSS has falsely communicated to the public through various media that its Counterfeit Props are genuine Ischebeck Megashore props.

118.    For example, during the time that CSS has commingled its Counterfeit Props with genuine Megashore props, the CSS website has featured links to "MegaShore" brochures and technical documents, which documents expressly describe and depict Ischebeck's Megashore props.

119.    CSS has also used photos that represent to customers that CSS offers only genuine Ischebeck Megashore equipment. For example, until very recently, the CSS website's "Project Gallery" page for the "MegaShore System" featured near-identical photos that Ischebeck uses in its own Megashore product brochure, as seen here:

 

*Ischebeck Megashore Product Brochure*       *CSS "MegaShore" Project Gallery*

120.    The CSS "MegaShore" project gallery even featured the ISCHEBECK TITAN trademark and logo, as seen here:



121.    A video on the CSS YouTube account promotes the "Mega Shore Table System" using video that shows only genuine Ischebeck Megashore equipment, such as an Ischebeck Megashore prop with the distinctive octagonal shape, the blue-colored disk, and even an ISCHEBECK TITAN logo, as seen here:



122.     Similarly, a July 10, 2022 post on the CSS Instagram account featured a video depicting "Megashore" equipment, as seen here:



123.     The props in the video show the distinctive octagonal shape and blue-colored disk of the genuine Megashore props, as well as an ISCHEBECK TITAN trademark and logo, as seen here:



124.    Through communications like these, CSS has communicated to the consuming public that **<u>all</u>** its props are genuine Megashore props, as they were before CSS began its counterfeit campaign.

125.    On information and belief, customers have placed orders with CSS or one of CSS's distributors for Ischebeck Megashore props, and CSS has provided those customers with CSS's counterfeit equipment instead of Ischebeck equipment.

126.    For example, on information and belief, Form Tech Concrete Forms, Inc. ("Form Tech") is and/or has been a customer of CSS and offers shoring and forming equipment received from CSS to its own end-user customers. The Form Tech website[3] promotes the "Ischebeck Titan MegaShore System" and provides related brochures that prominently feature the Ischebeck Marks

---

3 *www.formtechinc.com*

and Megashore Prop Trade Dress. On information and belief, Form Tech received the brochures from CSS.

127.    The cover of the "MegaShore Support System" brochure at the Form Tech website features a genuine Ischebeck Megashore prop with the distinctive octagonal outer tube and blue-colored disk, as seen here:



128.    On information and belief, CSS has provided both genuine Ischebeck Megashore props and Counterfeit Props to Form Tech in response to Form Tech orders for Ischebeck Megashore props.

129.    On information and belief, Form Tech was not aware that it received Counterfeit Props in response to orders for Megashore props.

130.    On information and belief, CSS has provided Counterfeit Props to other customers who ordered genuine Ischebeck Megashore equipment.

131.    For example, White Cap Construction Supply ("White Cap") is and/or has been a CSS customer. White Cap's 2022-2023 Full Line Catalog promotes "Megashore" equipment provided by Concrete Support Systems. The catalog features a photo of genuine Ischebeck Megashore equipment—the same photo that Ischebeck uses for its Ischebeck Megashore literature. Pictured below is an image of the White Cap catalog page for "Megashore."[4]



---

[4] *https://whitecap.dcatalog.com/v/Full-Line-Catalog-2022-2023/?page=524*

132.    Pictured below is an image from the cover of an Ischebeck brochure for the Megashore shoring system.



133.    As can be seen, the Megashore photo in the White Cap catalog is the same as the photo from the Ischebeck brochure.

134.     On information and belief, CSS provided White Cap with the photograph and text copy that appears in the White Cap catalog in connection with "Megashore" equipment.

135.     On information and belief, CSS has provided both genuine Megashore props and Counterfeit Props to White Cap in response to White Cap orders for Megashore props.

136.     On information and belief, White Cap was not aware that it received Counterfeit Props in response to orders for Megashore props.

**IV.     CSS Makes False Claims about its Counterfeit Props.**

137.     CSS has also made false claims about its Counterfeit Props to the consuming public.

138.     For example, on information and belief, CSS makes false claims about the testing and safety of its Counterfeit Props.

139.     From 2012 through at least September 2022—well after CSS began offering Counterfeit Props—the "About" page of the CSS website[5] featured the following claims:

> Our team has completed years of research and development in order to introduce the strongest, fastest and most economical systems for concrete construction. All of our systems have been rigorously tested at accredited laboratories and can be found performing on concrete construction projects across North America. Our products are the safest, most efficient and economical systems available on the market.

140.     The current CSS website has a hyperlink to the LinkedIn profile of Mark Grace, which features the claims seen in the image below:

---

[5] *http://www.concretesupportusa.com/about-concrete-support-systems/*



**President and Chief Executive Officer**
Concrete Support Systems, LLC
Apr 2012 - Present · 11 yrs 3 mos
United States

Concrete Support Systems, LLC is the leading supplier of concrete shoring and self-climbing formwork systems in North America. We have completed years of research and development in order to introduce the strongest, fastest and most economical concrete shoring and self-climbing formwork systems for concrete construction. All of our systems have been rigorously tested at accredited laboratories and can be found performing on concrete construction projects across North America. Our products are the safest, most efficient and economical available on the market. Our dedication to servicing your project means on time delivery for you, your customer and the owner. We will make sure your success is sustainable by ensuring that our advantage is your advantage.

141.    On the CSS page of the Indeed job search website,[6] under the heading "About Concrete Support Systems," CSS makes the following claims:

> Our team has completed years of research and development in order to introduce the strongest, fastest and most economical systems for concrete construction. All of our systems have been rigorously tested at accredited laboratories and can be found performing on concrete construction projects across North America. Our products are the safest, most efficient and economical systems available on the market.

142.    On information and belief, the statement that all CSS systems have been rigorously tested at accredited laboratories is false, at least because the Counterfeit Props have not been tested at accredited laboratories.

143.    The statement that CSS products are the "safest" products on the market is also false. In the context in which the claim is presented, reasonable consumers would understand the claim to be a statement of fact. CSS makes the statement with the purpose of having it accepted as a statement of fact.

---

[6] *https://www.indeed.com/cmp/Concrete-Support-Systems*

144.    These are not the only false statements that CSS makes about the Counterfeit Props. CSS takes data obtained from testing **_only_** Ischebeck's genuine Megashore equipment and presents it as if it also applies to the Counterfeit Props.

145.    The data does not relate to the Counterfeit Props, but CSS presents the data in a way that causes consumers to believe that it applies to **_all_** the equipment CSS offers under the "Megashore" name (including the Counterfeit Props).

146.    The image below shows a chart from the "Megashore Support System" literature used by CSS:





147.    The image below shows a chart from Ischebeck's own product literature relating to genuine Megashore equipment:



148.    As can be seen, CSS is presenting data about genuine Ischebeck Megashore equipment as if it applied equally to the Counterfeit Props.

149.    CSS customers are repeating CSS's misrepresentations to their own customers and potential customers. For example, the White Cap catalog claims that "Megashore" equipment has a "22,050 lb. safe working load rating per leg," as seen in the image below:



150.     On information and belief, White Cap is repeating information it received from CSS and is making the claim in connection with Counterfeit Props received from CSS. On information and belief, White Cap is not aware that CSS has never tested the Counterfeit Props.

151.     In a November 2022 letter to CSS counsel, Ischebeck raised the issue of CSS's dubious claims about the performance of Counterfeit Props. In response, CSS claimed that its Counterfeit Props had been "thoroughly tested for safety and efficacy." CSS provided testing information that it claimed was "sufficient to substantiate the performance testing of non-Ischebeck shoring equipment."

152.     CSS's representation was false. The testing information actually related to a different product—**not** the Counterfeit Props.

153.     On information and belief, CSS knew that the information it provided to Ischebeck was not related to the Counterfeit Props that CSS was selling, and CSS intended for Ischebeck to believe that the data related to the Counterfeit Props.

154.     On information and belief, CSS provided the information about a different product because it has no testing data for the Counterfeit Props.

155.     On information and belief, CSS continues to use Ischebeck Megashore testing data in connection with non-Ischebeck products, including the Counterfeit Props.

156.     CSS's false advertisement regarding equipment capacities has injured and will continue to injure Ischebeck by diverting revenues that Ischebeck would otherwise realize and by harming and threatening to harm Ischebeck's business reputation.

157.     CSS and Ischebeck are direct competitors in the U.S. market for concrete shoring and forming equipment. CSS and Ischebeck offer their respective products to the same customers through the same channels of trade, including trade shows and digital media.

158.     Customers of concrete forming and shoring equipment, such as construction contractors, rely on equipment providers' representations about the safety and load-bearing capacities of their equipment. The lives of construction workers and others depend on reliable shoring equipment, and a failure of shoring equipment could have catastrophic human and financial consequences.

159.     In the environment of confusion cultivated by CSS, the public would mistakenly and unjustly attribute to Ischebeck a failure of CSS's Counterfeit Props. This could destroy Ischebeck's hard-earned business reputation.

160.     If contractors and other customers knew that CSS's props were un-tested and/or that the data CSS uses does not relate to the non-Ischebeck props, those customers would demand genuine Ischebeck Megashore props.

161.     Thus, CSS is not only relying on Ischebeck's reputation and goodwill by using the Ischebeck Marks and Megashore Prop Trade Dress; CSS is also free-riding on Ischebeck's testing data, thereby avoiding the burden of testing its own Counterfeit Props.

162.     Ischebeck has no control over the quality of CSS's counterfeit equipment, and failure of CSS's counterfeit equipment, especially when combined with genuine Ischebeck props, could have catastrophic consequences for Ischebeck's business reputation.

163.     For example, suppose CSS's counterfeit equipment failed at a jobsite, leading to a slab collapse. In the aftermath of such an incident, it would be all but impossible to distinguish between counterfeit and genuine equipment crushed under the collapse, and it would be impossible to prevent members of the industry from falsely concluding that Ischebeck's equipment had failed. Such an event could permanently harm, or even destroy, Ischebeck's business reputation and goodwill.

164.     Through its false advertising, its blatant imitations of the Megashore Prop Trade Dress, and its unauthorized use of the Ischebeck Marks and confusingly similar marks in connection with non-Ischebeck products, CSS is misappropriating the goodwill inherent in the Ischebeck Marks and the Ischebeck Megashore Prop Trade Dress.

165.     In November 2022, Ischebeck counsel sent a letter to CSS counsel demanding that CSS cease its confusion campaign, including its unlawful use of the Ischebeck Marks in connection with non-Ischebeck products and its unlawful provision of Counterfeit Props.

166.     Since that time, counsel for the parties have had an ongoing discussion of the issues. CSS has refused to stop offering the Counterfeit Props. CSS revised its website and has apparently ceased use of Ischebeck Marks in connection with non-Ischebeck products, but CSS has indicated that it may decide to resume infringing use of the Ischebeck Marks at any time.

167.     On information and belief, Defendant Mark Grace has personally directed and participated in all the unlawful actions complained of herein. Mark Grace has also personally profited from the unlawful actions.

168.     For example, Mark Grace has posted images on his personal LinkedIn account of commingled Counterfeit Props and genuine Megashore props, referring to all the equipment as "Megashore" equipment. Mark Grace has provided hyperlinks from the CSS home page to his personal LinkedIn account. Mark Grace managed communications with Ischebeck regarding the rental and return of Ischebeck equipment after the termination of the Distributor Agreement.

169.     Accordingly, Mark Grace is personally liable, jointly and severally with CSS, for the unlawful actions described herein.

## COUNT I:
## False Designation of Origin

**(15 U.S.C. § 1125(a))**

170.    Ischebeck repeats and realleges each of the other allegations as if set forth in full herein.

171.    Ischebeck designed, developed, and manufactured Ischebeck Megashore props.

172.    During the term of the Distributor Agreement, CSS previously offered Ischebeck Megashore props with authorization from Ischebeck.

173.    Without authority or approval from Ischebeck, CSS offered Counterfeit Props that are designed to look exactly like Ischebeck Megashore props.

174.    Without authority or approval from Ischebeck, CSS promoted and promotes its products in a manner designed to make customers believe the non-Ischebeck imitation equipment is genuine Ischebeck equipment.

175.    On information and belief, in response to customer orders for Ischebeck products, CSS has substituted its own imitation equipment for Ischebeck equipment without the customers' knowledge.

176.    CSS's wrongful designation of origin has caused customer confusion and a likelihood of customer confusion as to the source of the knock-off products and/or as to CSS's affiliation with Ischebeck.

177.    Due to CSS's unlawful actions as described herein, Ischebeck has suffered and will continue to suffer damage to its business reputation and goodwill, and the loss of sales, leases, and other profits that Ischebeck would have earned but for CSS's actions.

178.    Because of Defendants' unlawful actions, Ischebeck is entitled to injunctive relief, an accounting for profits, damages, costs, and reasonable attorneys' fees pursuant to 15 U.S.C. §§

1114, 1116 and 1117. Ischebeck is further entitled to have its profits award enhanced and its damages award trebled as authorized by 15 U.S.C. § 1117.

## COUNT II:
### Trademark Infringement
### (15 U.S.C. § 1114)

179.    Ischebeck re-alleges and incorporates by reference the other allegations of the Complaint as if fully set forth herein.

180.    Ischebeck GmbH owns all rights in the Ischebeck Registrations, as well as the Marks therein.

181.    The Ischebeck Registrations are incontestable.

182.    Ischebeck and CSS are direct competitors in the market for concrete shoring and forming equipment.

183.    Defendants have used and are using in commerce marks that are identical or confusingly similar to the marks in the Ischebeck Registrations, including "Megashore" "MegaShore," "Mega Shore," "HV," and/or "Titan," in connection with non-Ischebeck products.

184.    Defendants' actions are likely to cause confusion, or to cause mistake, or to deceive, in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

185.    Upon information and belief, Defendants' actions have been undertaken with an intentional, willful, or malicious intent to trade upon the good will in Ischebeck's marks, with reckless disregard for Ischebeck's rights, with bad faith, and with intent to injure Ischebeck and deceive the public.

186.    Defendants' actions, as alleged above, have caused and will continue to cause damages to Ischebeck.

187.    Unless this Court enjoins Defendants' actions, Ischebeck will suffer irreparable harm to its business reputation and good will as a direct result of Defendants' actions.

188.    Because of Defendants' unlawful actions, Ischebeck is entitled to injunctive relief, an accounting for profits, damages, costs, and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1114, 1116 and 1117. Ischebeck is further entitled to have its profits award enhanced and its damages award trebled as authorized by 15 U.S.C. § 1117.

<u>**COUNT III:**</u>
**Trademark Infringement**
**(15 U.S.C. § 1125(a))**

189.    Ischebeck repeats and realleges each of the other paragraphs as if set forth in full herein.

190.    Ischebeck GmbH owns all rights in the Ischebeck Marks.

191.    The Ischebeck Marks are distinctive and valuable source identifiers of Ischebeck's products and services.

192.    Defendants' uses of "Megashore" "MegaShore," "Mega Shore," "HV," and/or "Titan" in connection with non-Ischebeck shoring and/or forming equipment are likely to cause confusion, or to cause mistake, or to deceive customers and potential customers and members of the public as to the affiliation, connection or association between Ischebeck and CSS, or as to the origin, sponsorship, authorization or approval of CSS's goods by Ischebeck.

193.    Ischebeck has not authorized Defendants' uses of confusingly similar marks with non-Ischebeck equipment.

194.    Upon information and belief, Defendants' actions have been undertaken with an intentional, willful, or malicious intent to trade upon the good will in Ischebeck's marks, with

reckless disregard for Ischebeck's rights, with bad faith, and with intent to injure Ischebeck and deceive the public.

195.    Defendants' deceptive acts have injured Ischebeck in an amount to be determined at trial.

196.    Unless the foregoing actions are enjoined, Ischebeck will continue to suffer irreparable damage, for which it has no adequate remedy at law.

197.    Because of Defendants' unlawful actions, Ischebeck is entitled to injunctive relief, an accounting for profits, damages, costs, and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1114, 1116 and 1117. Ischebeck is further entitled to have its profits award enhanced and its damages award trebled as authorized by 15 U.S.C. § 1117.

<u>**COUNT IV:**</u>
**Trade Dress Infringement**
**(15 U.S.C. § 1125(a))**

198.    Ischebeck repeats and realleges each of the other paragraphs as if set forth in full herein.

199.     The Megashore Prop Trade Dress has acquired distinctiveness as a source identifier, and it had acquired distinctiveness long before CSS began offering Counterfeit Props.

200.    The Megashore Prop Trade Dress is non-functional.

201.    Defendants' marketing, sales, leasing, and/or offering for sale or lease of the Counterfeit Props is likely to cause confusion, or to cause mistake, or to deceive customers and potential customers and members of the public as to the affiliation, connection or association between Ischebeck and CSS, or as to the origin, sponsorship, authorization or approval of CSS's goods by Ischebeck.

202.    Ischebeck has not authorized Defendants' uses of equipment that is confusingly similar to the Megashore Prop Trade Dress.

203.    Upon information and belief, Defendants' actions have been undertaken with an intentional, willful, or malicious intent to trade upon the good will in Ischebeck's trade dress, with reckless disregard for Ischebeck's rights, with bad faith, and with intent to injure Ischebeck and deceive the public.

204.    Defendants' deceptive acts have injured Ischebeck in an amount to be determined at trial.

205.    Unless the foregoing actions are enjoined, Ischebeck will continue to suffer irreparable damage, for which it has no adequate remedy at law.

206.    Because of Defendants' unlawful actions, Ischebeck is entitled to injunctive relief, an accounting for profits, damages, costs, and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1114, 1116 and 1117. Ischebeck is further entitled to have its profits award enhanced and its damages award trebled as authorized by 15 U.S.C. § 1117.

## COUNT V:
### False Advertising
### (15 U.S.C. § 1125(a))

207.    Ischebeck repeats and realleges each of the other paragraphs as if set forth in full herein.

208.    As stated herein, Defendants have made and distributed in interstate commerce advertisements that contain material false statements of fact, including assertions that:

    a.      all the products offered by CSS under the Megashore name are Ischebeck products;

    b.      all CSS products have been tested by accredited laboratories;

    c.      all CSS products are the "safest" products on the market; and

      d.    Ischebeck Megashore performance data applies to CSS's non-Ischebeck equipment.

209.    Defendants' foregoing statements are and were commercial speech intended for the purpose of influencing customers to buy and/or rent Defendants' products and/or services.

210.    Defendants' statements constitute false advertising in violation of 15 U.S.C. § 1125(a).

211.    Defendants' statements are literally false or, if not literally false, are misleading and confusing.

212.    Defendants' statements actually deceived or had the tendency to deceive a substantial segment of potential consumers.

213.    Defendants' statements are material in that the statements are likely to influence consumers' purchasing and/or leasing decisions.

214.    Defendants' false and misleading advertising statements and omissions cause commercial injury to Ischebeck, at least by diverting sales that would otherwise go to Ischebeck. If customers knew the truth about CSS's inferior imitation equipment, they would not purchase or lease the equipment, and they would instead purchase or lease Ischebeck equipment.

215.    As a result of CSS's false and misleading advertising, Ischebeck has suffered damages in an amount to be determined at trial.

216.    Unless the foregoing actions are enjoined, Ischebeck will continue to suffer irreparable damage, for which it has no adequate remedy at law.

**COUNT VI:**
**Violation of Connecticut Unfair Trade Practices Act**
**(Conn. Gen. Stat. § 42-110a *et seq.*)**

217.    Ischebeck repeats and realleges each of the other paragraphs as if set forth in full herein.

218.     At all relevant times, CSS was a "person" within the meaning of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, et seq. ("CUTPA") and was acting in the conduct of its trade or commerce within the meaning of CUTPA.

219.     CSS willfully and knowingly engaged in actions that are unethical, unscrupulous, and offensive to public policy and acted in bad faith and with willful and malicious intent, all of which both individually and together constitute unfair and deceptive acts and practices in the conduct of trade or commerce, in violation of CUTPA.

220.     CSS's conduct was intentional in that it knew or should have known that its conduct would cause injury to consumers and ascertainable harm to Ischebeck.

221.     Further, due to CSS's foregoing actions, consumers place an order with CSS intending to purchase and/or lease what they believe to be a genuine Ischebeck product and instead receive a counterfeit CSS product, causing injury to both the consumers and Ischebeck—a result CSS fully intended.

222.     As a result of the foregoing unfair and deceptive acts and practices, Ischebeck has suffered a measurable, ascertainable loss within the meaning of Conn. Gen. Stat. § 42-110g(a) including through CSS's intentional consumer confusion and the resulting damage to Ischebeck's goodwill and reputation and Ischebeck has suffered, and will continue to suffer, damages in an amount to be determined at trial.

223.     Accordingly, Ischebeck is entitled to punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a), in addition to compensatory damages, costs, and attorneys' fees.

224.     Pursuant to Conn. Gen. Stat. § 42-110g(c), Ischebeck will provide due notice of its claims to the Attorney General of the State of Connecticut and to the Commissioner of Consumer Protection for the State of Connecticut.

## COUNT VII:
### Breach of Implied-In-Fact Contract

225.    Ischebeck repeats and realleges each of the other paragraphs as if set forth in full herein.

226.    Ischebeck USA and CSS formed an implied-in-fact contract as described herein.

227.    The terms of the implied-in-fact contract, and CSS's assent to those terms, are derived from the continued conduct of Ischebeck USA and CSS, their course of dealing, their course of performance and the facts and circumstances surrounding their business relationship.

228.    Ischebeck USA substantially performed its obligations under the implied-in-fact contract.

229.    CSS breached the implied-in-fact contract (as modified by the return agreement) by at least the following acts and omissions:

      a.    CSS failed to return all Ischebeck equipment leased to CSS, pursuant to the parties' implied-in-fact contract;

      b.    CSS has improperly transferred Ischebeck equipment from one customer jobsite to another customer jobsite instead of returning the Ischebeck equipment to Ischebeck after completion of the job or project, pursuant to the parties' implied-in-fact contract;

      c.    CSS failed to pay for the repair of damaged equipment, in violation of the parties' implied-in-fact contract; and

      d.    CSS failed to pay Ischebeck the rate of 2% of the list price of Ischebeck products for all Ischebeck material remaining in CSS's possession after April 1, 2022, pursuant to the parties' implied-in-fact contract.

230.    These damages include, but are not limited to, the total amounts due in unpaid invoices, the value of the unreturned equipment, and profits Ischebeck would have otherwise earned had its equipment been timely returned.

### COUNT VIII:

47

**Breach of Express Contract**
**(in addition or in the alternative)**

231.     Ischebeck repeats and realleges each of the other paragraphs as if set forth in full herein.

232.     The Distributor Agreement was a binding contract between Ischebeck USA and CSS.

233.     Ischebeck USA substantially performed its obligations under the Distributor Agreement.

234.     CSS breached the Distributor Agreement through at least the following acts and omissions:

      a.     CSS failed to return all Ischebeck equipment in CSS's possession at the time of termination (in violation of sections 17.4 and 8.4 of the Distributor Agreement);

      b.     CSS failed to return all other Ischebeck equipment upon completion of then-ongoing customer jobs and projects (in violation of sections 17.4 and 8.4 of the Distributor Agreement);

      c.     after the Distributor Agreement was terminated, CSS continued activity tending to give the impression that the relationship between Ischebeck USA and CSS still existed (in violation of section 17.4 of the Distributor Agreement); and

      d.     CSS distributed confidential information and material to third parties without consent from Ischebeck (in violation of section 12 of the Distributor Agreement).

235.     CSS's material breaches have damaged Ischebeck in an amount to be proven at trial. These damages include, but are not limited to, the total amounts due in unpaid invoices, the value of the unreturned equipment, and profits Ischebeck would have otherwise earned had its equipment been timely returned.

**COUNT IX:**

**Unjust Enrichment
(in addition or in the alternative)**

236.     Ischebeck repeats and realleges each of the other paragraphs as if set forth in full herein.

237.      If it should be determined as a matter of law that there was no contract (express or implied) between the parties, Ischebeck pleads in the alternative that CSS was unjustly enriched.

238.     By providing CSS with Ischebeck equipment, Ischebeck conferred benefits onto CSS.

239.     CSS has failed and refused to return to Ischebeck the Ischebeck equipment, that Ischebeck provided to CSS. CSS has not otherwise paid for these benefits.

240.     The Ischebeck equipment in CSS's possession (or in the possession of CSS's customers) rightfully belongs to Ischebeck, and the unlawful retention of these benefits has been to the detriment of Ischebeck.

241.     Allowing CSS to retain these benefits violates fundamental principles of justice, equity and good conscience, and these benefits or the value of these benefits should instead be restored to Ischebeck.

**PRAYER FOR RELIEF**

WHEREFORE, Ischebeck prays this Court enter judgment in its favor on all counts and grant the following relief against CSS:

A. An Order of the Court that CSS, its agents, servants, employees, attorneys, partners, licensees, divisions, affiliates, parent corporation(s), and all others in active concert or participation with any of them are permanently enjoined from committing any acts, continuing its acts, or committing any further acts of infringement, passing-off, false

advertising, or unfair competition, including but not limited to:

    a. From continuing to pass off its knock-off products as genuine Ischebeck equipment;

    b. From using, in connection with the promotion, advertising, offering, or sale of their services and products, the Ischebeck Marks or any other designation that is confusingly similar to the Ischebeck Marks or that is likely to cause confusion with the Ischebeck Marks;

    c. From otherwise unfairly competing with Ischebeck in any manner, including falsely representing themselves as being connected with, sponsored by, or associated with Ischebeck;

B. An Order of this Court requiring CSS to file with the Court and serve on Ischebeck, a written report under oath setting forth in detail the manner and form in which CSS has complied with the injunction within 30 days of service of the order of injunction, pursuant to 15 U.S.C. § 1116(a);

C. An award of monetary damages sufficient to compensate Ischebeck for the injuries suffered as a result of CSS's wrongful conduct;

D. In the event this Court finds CSS liable for unjust enrichment, restoration of the unreturned equipment—or the value of the unreturned equipment—that has been unjustly retained by CSS to the detriment of Ischebeck;

E. An award of actual damages and CSS's profits and unjust enrichment realized from their infringement, false advertising, false designation, and unfair and deceptive practices;

F. Treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117 on a finding that this case is exceptional and that CSS's wrongful activity has been willful;

G. Punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a), in addition to compensatory damages, costs, and attorneys' fees.

H. An award of pre- and post-judgment interest, costs, and reasonable attorneys' fees expended in this action under all relevant authority; and

I. Such other and further relief as this Court deems just and proper.

Dated: July 10, 2023

**GFELLER LAURIE LLP**
Melicent B. Thompson, Esq. (ct19868)
977 Farmington Ave., Suite 200
West Hartford, CT 06107
Tel. (860) 760-8400
Fax. (860) 760-8401
mthompson@gllawgroup.com
*Counsel for Plaintiffs Ischebeck USA, Inc.*
*and Friedr. Ischebeck GMBH*